Filed 3/24/20

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B294888 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA112295) |
| v. | |
| CAMINERO WANG, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County.  Bruce F. Marrs, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Caminero Wang appeals the judgment entered following a jury trial in which he was convicted of the first degree murders of his mother-in-law, Shu Zhang, and his father-in-law, Aiping Diao. (Pen. Code,[1] § 187, subd. (a); counts 1 & 2, respectively.) As to both murders, the jury found true the allegations that appellant personally and intentionally discharged a firearm causing death. (§ 12022.53, subds. (b)–(d).) The jury also found the multiple-murder special circumstance to be true. The trial court imposed an aggregate sentence of life without the possibility of parole plus 50 years to life.[2]

Appellant contends reversal is required due to various instructional and evidentiary errors, prosecutorial misconduct, ineffective assistance of counsel, and cumulative error. Appellant also argues that the trial court erred in failing to consider whether to impose a lesser firearm enhancement.

We reject all of appellant's challenges and affirm the judgment.

## FACTUAL BACKGROUND

### *The Prosecution Case*

#### 1. Background

Appellant and Li[3] met each other in China through their parents, and were married within a month. At the time,

---

[1] Undesignated statutory references are to the Penal Code.

[2] The sentence consisted of life without the possibility of parole plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement on count 1. The court imposed the same sentence on count 2, to run consecutively.

[3] We refer to appellant's wife, Li, by her first name as was done at trial.

appellant had been living in the United States for about 20 years. After marrying, Li remained in China for over a year until 2007 when she received her visa and was able to move to the United States. They had three children, one daughter and two younger sons who were eight, six, and three years old in April 2016.

Throughout their marriage, appellant controlled Li's daily activities and finances, requiring her to seek his permission to do almost anything. In 2011, Li obtained her nursing license, but appellant did not allow her to work. Appellant frequently started fights with Li. During every argument, appellant engaged in verbal abuse and threatened violence against Li and her parents, who were in China. During one altercation, appellant became extremely angry, cursed at Li and threatened to kill her. In the middle of the argument, appellant started to run upstairs. Li knew appellant kept guns upstairs in a gun safe, and she thought appellant was going upstairs to get a gun. Li believed the only reason appellant did not retrieve a gun on that occasion was that he injured his foot on the stairs and appellant's mother yelled at him. During another argument in March 2013, Li suffered injuries and was bleeding from her nose and mouth after appellant punched her.

After this incident, Li took the children to China for two years. She returned to the United States with the children in February or March 2015. At first, appellant was nice to Li; he had a job, he helped with the chores, and he was good with the children. The family moved into a townhouse in West Covina in July 2015. But a month later, appellant lost his job and reverted "back to his old self," arguing with Li all day and threatening her parents. In September 2015, Li started working three to four days a week.

Li's parents, Zhang and Diao, arrived from China in December 2015 for a four-month stay with Li and appellant. The parents did not speak English, and their cell phones did not work in the United States. They stayed in an upstairs bedroom down the hallway from appellant's master bedroom. Li's parents did not like appellant, and at some point they changed their return flight to China from April 19 to April 15, 2016, because they felt uncomfortable in the house with him.

### 2. Reports of Multiple Gunshots

On April 13, 2016, Li went work at 6:30 p.m., leaving her parents, the three children, and appellant at home.

About two hours later, several neighbors and others in the area called 911 to report hearing multiple gunshots. One neighbor reported hearing over 20 gunshots, children crying, and one child yelling for his or her mother. Appellant's next door neighbor was awakened by gunshots and heard children crying. Another person heard a boy screaming in the townhouse across the street and saw a man on the second floor pacing back and forth before closing the blinds and turning off the light.

### 3. The Scene of the Shooting

Around 8:55 p.m. two West Covina police officers responding to the 911 dispatch knocked on the front door of appellant's two-level townhouse. Appellant came down the stairs and immediately answered the door. He appeared to be frightened and showed symptoms of being under the influence of methamphetamine.[4] More officers arrived, and appellant was detained and handcuffed. One officer kicked in the door to the

---

[4] The parties stipulated that appellant's blood test had come back negative for alcohol and any illicit drugs.

downstairs bathroom and found the children. The youngest child had blood spatter and smeared blood on his pajamas. Other officers proceeded upstairs and found Zhang's body at the top of the stairs near the door to the master bedroom. Diao's body was down the hallway to the right outside a bedroom. The scene was "horrific," and there was blood everywhere.

Zhang's brain matter could be seen around her head and splattered on the wall behind her head. There was high velocity blood spatter on the wall, which indicated the shot had been fired close to her head in an upward direction. She was missing several front teeth and there was a bullet hole in her mouth. Police recovered a tooth and an expended bullet casing from the stairs leading to the second floor.

Brain matter mixed with coagulated blood was around Diao's head. The shape and pattern of blood spatter on the nearby bedroom door indicated that Diao was lying on the floor when he was shot. Two bullets were lodged in the hardwood floor under Diao's torso. Bullets also went through the back of Diao's torso and straight through the ceiling below.

A meat cleaver was found on the floor next to Diao's left hand. The knife was positioned oddly in relation to the body and seemed out of place because it appeared spotless despite the amount of blood at the scene.[5]

### 4. Investigation and Evidence

Police recovered 11 expended bullets and 18 expended bullet casings from the residence. There were bullet holes in the high-vaulted ceiling above the front door and two bullet holes in

---

[5] Although there was no visible blood on the meat cleaver, it did have some dried blood on it.

the ceiling of the first floor office. On the desk in the office police found a computer with two tabs open for the West Covina police department along with a sheet of paper with the address of the West Covina police station written in appellant's hand.

In the closet of the master bedroom police found a semiautomatic .45-caliber FNH model FNX-.45 handgun with an empty 10-round magazine inside it. The gun was in "slide lock," that is, the slide was locked to the rear, which happens when the last round is fired or the gun has been locked manually. A gun holster and two other 10-round magazines were found next to the gun; one had one round remaining, and the other had 10 rounds. Four more firearms, pistol boxes, and three boxes of ammunition were recovered from two locked gun safes in the master bedroom. Rifle ammunition was also found in the downstairs closet. All of the firearms were registered to appellant.

All 18 of the cartridge casings recovered, all of the expended bullets, and those bullet fragments not too damaged or small to be analyzed were determined to have been fired from the FNH handgun. The firearm was in proper working condition and it had five to six different safety mechanisms that were all in proper working order.

Appellant had no injuries. A gunshot residue test revealed that appellant had gunshot residue on his hands. The single source DNA profile on the trigger of the handgun matched appellant, and Zhang and Diao were excluded as possible sources. Bloodstains on the floor of the master bathroom matched Zhang's DNA profile.

### 5. The Autopsies

Zhang suffered a total of 12 gunshot wounds, eight of which were fatal. The autopsy showed bleeding in the wound path of

6

many of the wounds, indicating that Zhang was still alive when she suffered those wounds.

Zhang sustained two fatal wounds to her head, both of which would have caused her to lose consciousness and were very quickly fatal. One bullet entered her cheek, passed through the skull injuring her brain, and exited the skull through the back of her head. The other fatal head wound was around Zhang's lips. Soot on the soft tissues underneath and behind her lips indicated the gun was in Zhang's mouth when it was fired. The bullet lodged in Zhang's brain.

Diao also suffered 12 gunshot wounds, 11 of which were fatal. Many of these wounds were suffered when he was still alive. Diao sustained six fatal gunshot wounds to the head, one to the right lung, three to the left lung, and one wound to the abdomen. Three of the bullets from the gunshots to the head were recovered from Diao's brain. Diao sustained one nonfatal wound to his neck, but that bullet lodged in his skull, and the wound would have incapacitated and caused him to lose consciousness. With one exception, all of the bullets that struck Diao travelled from the back to the front of his body.

### The Defense Case

Gunshot residue was collected from both Diao's and Zhang's hands, which indicated they "may have discharged a firearm" or may have been in the area of the discharged firearm or gunshot residue.

Appellant testified in his own defense.

Appellant stated that the only time he ever laid hands on his wife was during the 2013 incident when he hit her on the side of the head once or twice. He felt "very sorry" about the incident and acknowledged that he should not have struck her.

When Li's parents came to visit in December 2015, appellant's unemployment became a source of tension, and appellant and his in-laws argued frequently. Appellant did not like Zhang and Diao because they disrespected him, and he did not like having them live in his home. Appellant knew that Zhang and Diao had a flight back to China on April 15, 2016.

On the night of the shooting, Li went to work and appellant stayed home with the children. He cooked and ate dinner with them and cleaned up while Li's parents stayed upstairs in their bedroom. After dinner Diao asked appellant to come upstairs. When appellant went to his in-laws' bedroom, they told him they wanted to continue living with appellant and Li. Appellant thought this was a very bad idea, and the conversation became heated as Zhang and Diao became very angry. Zhang pushed appellant and said, " 'Go ahead to [*sic*] punch me.' " Appellant stepped back into the hallway and put his hands behind his back. Zhang yelled, " 'Why don't you start the fight? Are you a coward?' " and threatened to hit her head on the wall if appellant did not fight her. When appellant did not respond, Zhang ran into the bedroom and returned with a meat cleaver. Standing about six feet from appellant, she put the meat cleaver up to her neck and said, " 'If you don't agree that we can stay here and live here, then I will cut myself or smash myself.' "

Zhang did not cut herself, and appellant thought she just wanted appellant to agree to let them stay. When appellant asked Zhang to put down the meat cleaver, Zhang said, " 'No. Right now, you have to agree.' " Appellant responded, " 'If you do want to kill yourself, there is no way for me to stop that.' . . . 'Well, it's your decision,' . . . 'but please, right now, please leave

my house.  Please go outside.  Once you go outside, you can do anything you want then.  It has nothing to do with me.' "

Diao then took the meat cleaver from his wife, and pointing it at appellant, moved closer and said, " 'I will cut your head off.' " At this, appellant threatened to call the police.  Zhang placed her hand on Diao's forearm and directed him toward their bedroom.

After Diao had left with the meat cleaver Zhang blocked appellant's way to the stairs and said, " 'Don't call the police.' " Appellant replied, " 'I'm for sure going to call the police because what my father-in-law did was illegal.' . . . 'After the police officer arrives, they're going to arrest my father-in-law, and they're going to put him in jail.' "  He then threatened that after Diao "is deported, he will never be issued a visa from the United States, and he will never come to the U.S. again."  Zhang dropped to her knees and pleaded, " 'Please don't call the police.' . . . 'Could you forgive us for my daughter's sake?' "  Appellant told Zhang to get out of his way.  Still on her knees, Zhang asked, " 'Is there anything that I can do to stop you from calling the police?' " Appellant told her he would not call the police only if she and Diao left the house with all of their belongings and never returned.

Appellant went into his room and closed the door to allow Zhang to speak privately with Diao.  He stayed there for no more than an hour. After a while, appellant asked through the closed door if they were done talking and if he could come out.  Hearing no response, appellant continued to wait in his room.  Appellant started to become "a little scared" because the house was so quiet, and his door was closed.  He decided to go out and have a look around.  Before leaving his room, appellant armed himself with a loaded gun from the nightstand because Li's parents had the

9

meat cleaver and had made threats. He did not have any intention of shooting anyone, but he thought that if his in-laws saw the gun they would leave the house.

Pointing the gun toward the ceiling with the safety off, appellant stepped into the hallway and immediately felt someone grab his leg. He looked down and saw Zhang on the floor. Appellant screamed at her to let him go. Suddenly Diao ran out of another bedroom and grabbed the gun. After a brief struggle Diao successfully wrested the gun away from appellant.

Diao pointed the gun at appellant and pulled the trigger four or five times, but the gun did not fire. Appellant realized that although the gun was loaded, it was not firing because there was no cartridge in the chamber. Appellant broke away from Zhang and tried to grab the gun from Diao. Zhang got up and joined the struggle. While they were all grappling for the gun, appellant heard the sound of "sliding and collision for the metal from the gun," and realized that a cartridge might have been chambered, which would allow the gun to be fired. Appellant yelled, " 'Danger. Be careful.' "

Zhang slipped and fell to the floor. As she was starting to get up, appellant heard two gunshots, and realized that Diao had accidentally pulled the trigger, firing two shots into Zhang's back. Appellant and Diao continued to struggle and another two more shots were fired directly into Zhang's face. Appellant gained control of the gun and was able to engage the gun safety.

Appellant relaxed a little but suddenly Diao ran into his bedroom and returned with the meat cleaver. As Diao charged toward him, appellant thought Diao was going to kill him. Panicked and in tremendous fear, appellant unlocked the gun's

10

safety and "shot nonstop" at Diao, continuing to squeeze the trigger even after no bullets remained in the gun.

Appellant checked Diao and Zhang after he had stopped shooting, but neither showed any signs of life. Appellant felt very sad and depressed. He did not know how he was going to tell Li about what had happened. Appellant wanted to end his life, and he tried to kill himself with the gun, but there were no bullets. He became very angry and threw the gun on the floor. Then he saw the meat cleaver. He picked it up and sat on Diao and Zhang's bed as he contemplated killing himself with it, but unable to bring himself to do it, he threw the meat cleaver on the floor. Appellant decided he "wanted to end [his] own life with the gun in [his] own master bedroom." He picked up the gun, went into his room, and put a new loaded magazine into the gun.

Appellant was "very pissed off, very angry" because his in-laws had brought this nightmare on him. He was so angry that, instead of shooting himself, he walked out of his bedroom and shot his dead in-laws several more times. He then reloaded the gun with a single bullet. Suddenly he thought about his three children. Appellant did not know where the children were, and he decided he needed to find them. He had not heard his children crying at any point during the incident, nor did he see his son at the top of the stairs or see any bloodstains on his youngest child's pajamas. After searching upstairs he eventually located the children in the downstairs bathroom.

Appellant then "googled" the phone number for the police station, but he did not call the police, fearing that they would respond with guns and a SWAT team, putting his children at risk. Instead, he wrote down the address of the police station and planned to take his children to report the incident in person.

11

Appellant was on his way upstairs when the police knocked on the door.

## DISCUSSION

### I. Instructional Error

The defense requested instruction on heat of passion and provocation pursuant to CALJIC No. 8.42 as to both counts. The trial court denied the request as to Zhang's killing in count 1, but found sufficient evidence supported the instruction as to the killing of Diao in count 2. However, in its instructions to the jury, the court erroneously omitted CALJIC No. 8.42, an error appellant contends warrants reversal of his first degree murder conviction on count 2. Appellant also challenges the trial court's denial of instructions on voluntary manslaughter as to the killing of Zhang based on heat of passion and imperfect self-defense.

### A. *Legal principles*

It is settled that in a criminal case, even absent a request, "a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury." (*People v. Booker* (2011) 51 Cal.4th 141, 181 (*Booker*); *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

However, " '[a]n instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).) "The 'substantial evidence requirement is not satisfied by " '*any*

evidence . . . no matter how weak' " ' " (*ibid*.), and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense" (*People v. Simon* (2016) 1 Cal.5th 98, 132). "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).) 'Manslaughter is the unlawful killing of a human being without malice.' (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*Nelson*, *supra*, 1 Cal.5th at p. 538; *Breverman*, *supra*, 19 Cal.4th at p. 154.)

Our Supreme Court has explained: "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) Legally sufficient provocation is that which " 'causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.' [Citation.] Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.' " (*Nelson*, *supra*, 1 Cal.5th at p. 539.)

"For purposes of the heat of passion doctrine, 'provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment.' [Citation.] The standard requires more than evidence that a defendant's passions were aroused. The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' " (*Nelson, supra*, 1 Cal.5th at p. 539.)

As for the subjective element of voluntary manslaughter based on provocation, the high court has explained that the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550; *Nelson, supra*, 1 Cal.5th at p. 539.) The court has emphasized that "it is not sufficient that a person 'is provoked and [then] *later* kills.' " (*Nelson*, at p. 539.) Rather, where " ' "sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter." ' " (*Moye*, at p. 550, quoting *Breverman, supra*, 19 Cal.4th at p. 163.)

Imperfect self-defense also reduces murder to voluntary manslaughter. (*People v. Soto* (2018) 4 Cal.5th 968, 970.) " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] '[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if*

14

*there is substantial evidence to support the defense.*" ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048–1049.)

**B.** ***The erroneous omission of a heat of passion instruction as to the count 2 killing of Diao was harmless***

Appellant contends that after finding sufficient evidence to support a heat of passion instruction as to the Diao killing, the trial court erred in omitting CALJIC No. 8.42. Appellant goes on to assert that because the omission withheld a theory of the defense from the jury's consideration, the error was structural and requires reversal per se. Alternatively, appellant maintains that the failure to instruct on the defense theory constituted federal Constitutional error subject to reversal under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Respondent counters that such instructional error is an error of California law only, which in this case was harmless under the state standards of reversibility set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *People v. Franklin* (2018) 21 Cal.App.5th 881, 890–891 (*Franklin*) [whether such an error amounts to federal constitutional error governed by *Chapman* or constitutes an error of state law only subject to *Watson* review remains unsettled].)

We find sufficient evidence supported instruction on heat of passion under CALJIC No. 8.42 as to the killing of Diao in this case, and therefore conclude that the trial court erred in omitting the instruction on count 2. (*Booker*, *supra*, 51 Cal.4th at p. 181.) However, contrary to appellant's assertion, the error is not reversible per se. Our Supreme Court has observed that "[i]n the nearly 50 years since *Chapman* was decided, the [United States Supreme Court] repeatedly has emphasized that most errors

15

implicating a federal constitutional right, including most instructional errors, are amenable to harmless error analysis and that only a 'very limited class of cases' are subject to per se reversal." (*People v. Aranda* (2012) 55 Cal.4th 342, 363 (*Aranda*).) Indeed, the high court has made "clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiat[e] *all* the jury's findings." ' " (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61.)

Structural errors " 'deprive defendants of "basic protections" ' [citation] and 'necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence' " (*Aranda*, *supra*, 55 Cal.4th at p. 364), or the assessment of the errors' effect is so difficult and speculative as to render any analysis of harm irrelevant. (See *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149, fn. 4; *Aranda*, at p. 365 ["An instruction that effectively lowers the prosecution's burden of proving guilt beyond a reasonable doubt is structural error because it 'vitiates *all* the jury's findings' and its effect on the verdict is 'necessarily unquantifiable and indeterminate' "].) Structural errors "include the denial of counsel, [citation], the denial of the right of self-representation, [citation], the denial of the right to public trial, [citation], and the denial of the right to trial by jury by the giving of a defective reasonable-doubt instruction." (*Gonzalez-Lopez*, at p. 149.)

Here, in light of the other instructions given, the trial court's omission of CALJIC No. 8.42 neither improperly lowered the prosecution's burden of proof nor effectively invalidated the jury's findings. We therefore conclude that the court's failure to instruct with CALJIC No. 8.42 as to count 2—while erroneous—is amenable to harmless error review. And even

under the more stringent *Chapman* standard, we find the error to be harmless beyond a reasonable doubt.

The jury in this case was instructed pursuant to CALJIC No. 8.20 that "[i]f you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection *and not under a sudden heat of passion or other condition precluding the idea of deliberation*, it is murder of the first degree." (Italics added.) The charge also defined second degree murder as an unlawful killing of a human being with malice aforethought where "the evidence is insufficient to prove deliberation and premeditation." (CALJIC No. 8.30.) Thus, in convicting appellant of first degree rather than second degree murder, the jury necessarily found the evidence sufficient to establish premeditation and deliberation, and also must have rejected the notion that appellant formed the intent to kill "under a sudden heat of passion or other condition precluding the idea of deliberation."

"It is well established that '[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.' " (*People v. Lancaster* (2007) 41 Cal.4th 50, 85; see *Franklin*, *supra*, 21 Cal.App.5th at p. 894; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1245–1246.) Here, because the jury's finding that appellant premeditated and deliberated the killing is manifestly inconsistent with having acted under the heat of passion, we conclude that the omission of CALJIC

17

No. 8.42 as to count 2 was harmless even under *Chapman*'s heightened federal constitutional standard.

**C.** ***The trial court properly denied appellant's request for heat of passion and imperfect self-defense instructions as to the killing of Zhang (count 1)***

Appellant also contends the trial court erred in denying the defense request for heat of passion and imperfect self-defense instructions on count 1. However, as to the killing of Zhang, the record is devoid of any evidence to support these theories, and the trial court had no duty to instruct on them. (*People v. Romero* (2008) 44 Cal.4th 386, 402–403; *Breverman*, *supra*, 19 Cal.4th at p. 154 [trial court not required to instruct on lesser included offenses "when there is no evidence that the offense was less than that charged"].)

It was the defense theory that Zhang's killing was an accident. According to appellant, when he and Diao were struggling over the gun, it fired accidentally, hitting Zhang in the back and face. Nothing in this scenario supports appellant's claim that he intentionally killed Zhang under a sudden heat of passion or because he actually believed he was in imminent danger of death or great bodily injury. Appellant nevertheless argues that the jury should have been permitted to reject appellant's claim of accident but still find that he did not act with malice aforethought. Appellant thus asserts that the jury could have found that appellant's passions were aroused when Li's parents attacked him, and, in response to this intense emotion, appellant intentionally shot Zhang without deliberation or judgment. This argument fails because there is simply no evidence of objectively sufficient provocation or that appellant was actually motivated by passion when he killed Zhang.

18

" 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim,' " and the victim's " 'conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*Moye, supra*, 47 Cal.4th at pp. 549–550; *Nelson, supra*, 1 Cal.5th at p. 540.) Indeed, " '[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649.) And " ' " '[i]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " ' " (*Ibid*.)

Zhang's provocative conduct here was simply grabbing appellant's leg from a position on the floor. Even assuming this conduct actually did incite appellant, " 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused' " unless the provocation was " 'such as would naturally tend to arouse the passion of the ordinarily reasonable man.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 950.) " 'A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.' " (*People v. Wells* (1938) 10 Cal.2d 610, 623.) We fail to see how Zhang's conduct would "drive any ordinary person to act rashly or without due deliberation and reflection." (*People v. Najera* (2006) 138 Cal.App.4th 212, 226.)

Similarly, there was no evidence to support an instruction on voluntary manslaughter based on imperfect self-defense as to the killing of Zhang. Our Supreme Court has cautioned that the doctrine of imperfect self-defense "is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " '*must be instantly dealt with.*' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 98.) Clearly, neither Zhang's threat to cut herself with the knife nor the act of grabbing appellant's leg placed appellant in any imminent peril. Moreover, appellant's testimony established that when he shot Zhang, she did not have the knife and was no longer grabbing appellant's leg.

## II. Evidentiary Claims

Appellant asserts the trial court prejudicially erred in admitting certain evidence at trial. We review the court's rulings on the admissibility and relevancy of evidence for abuse of discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 74; *People v. Clark* (2016) 63 Cal.4th 522, 590 (*Clark*).) Such rulings " 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534; *People v. Jackson* (2016) 1 Cal.5th 269, 330.)

### A. *The trial court did not abuse its discretion in admitting evidence of the 2013 domestic violence incident*

Appellant contends the trial court abused its discretion in admitting evidence of the uncharged 2013 domestic violence incident against Li because the evidence was inadmissible under

Evidence Code sections 1109 and 1101 and was more prejudicial than probative. We disagree.

*1. Relevant background*

Over defense objection, the trial court admitted evidence of the 2013 incident under Evidence Code sections 1109 and 1101, subdivision (b). In ruling the evidence admissible, the court explained that the evidence would "easily survive a[n Evidence Code section] 352 analysis," it was not unduly inflammatory, there was no risk of confusing the issues, the incident was not remote in time, and Li's testimony about it would not consume a great deal of time.

At trial Li testified that during an argument with appellant in 2013, appellant struck Li on the left temple with his closed fist while she was sitting on the couch holding the couple's six-month-old son. Li suffered a gash inside her mouth, redness and swelling on her forehead, and a loosened tooth. There was blood on the floor and Li was in pain from the injuries to her face. Appellant's father intervened to stop appellant from hitting Li again, and Li called 911.

Li told the responding officer that she had been sitting on the couch with her children when appellant pulled her hair and pinned her head to the armrest. After appellant stopped hitting her, Li reported that she saw stars and felt lightheaded. The officer observed blood, redness on the right side of Li's face, and a laceration on her upper gum in the front of her mouth. Police took appellant into custody and confiscated 12 handguns, 10 rifles, and 1 shotgun from the home.

Li testified that she wanted to divorce appellant, but her parents advised her to remain in the marriage. Li then went to

China for about two years. She returned after the criminal case based on the 2013 incident was over.

### 2. *Legal principles*

Ordinarily, evidence of prior criminal conduct is inadmissible to show a defendant's predilection to commit other criminal acts. (Evid. Code, § 1101, subd. (a).) However, in cases involving sexual offenses and domestic violence, the Legislature has created exceptions to the general prohibition against propensity evidence. (Evid. Code, §§ 1108, 1109; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232; *People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) In domestic violence cases, Evidence Code section 1109[6] " 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*Brown*, at p. 1232.)

The rationale underlying this exception is that by admitting evidence of a defendant's other acts of domestic violence to show a disposition to commit acts of domestic violence, the statute eliminates any presumption that "the charged offense was an isolated incident, an accident, or a mere fabrication." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876

---

[6] Section 1109 provides in relevant part: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Under subdivision (e), "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

(1995–1996 Reg. Sess.) June 25, 1996, p. 3 (Assembly Analysis of Senate Bill 1876); see *People v. Falsetta* (1999) 21 Cal.4th 903, 916–917 (*Falsetta*) ["[b]y reason of [Evid. Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se"]; *People v. Johnson* (2010) 185 Cal.App.4th 520, 532 (*Johnson*).)

Apart from admissibility under Evidence Code section 1109, evidence of a prior uncharged act may also be admissible to prove a disputed material fact—other than a criminal disposition—such as motive, intent, knowledge, or the absence of mistake or accident. (Evid. Code, § 1101, subd. (b); *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 631.)

Before a trial court may admit such other crimes evidence under Evidence Code section 1101, subdivision (b) or section 1109, it must, by balancing the factors set forth in Evidence Code section 352, determine whether the probative value of the evidence " 'is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Williams* (2013) 58 Cal.4th 197, 270 (*Williams*); *People v. Fruits* (2016) 247 Cal.App.4th 188, 202 (*Fruits*).)

" ' " '[P]rejudicial' " ' " in the context of the court's section 352 analysis " ' "is not synonymous with 'damaging.' " ' " (*Williams, supra*, 58 Cal.4th at p. 270; *Johnson, supra*, 185 Cal.App.4th at p. 534.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's

23

case. The stronger the evidence, the more it is "prejudicial." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Rather, evidence subject to exclusion under Evidence Code section 352 as unduly prejudicial is evidence " ' "which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues." ' " (*Williams*, at p. 270; *Fruits*, *supra*, 247 Cal.App.4th at p. 205.)

Other factors relevant to the Evidence Code section 352 analysis include: whether the prior act of domestic violence is more inflammatory or egregious than the current offense; whether the presentation of the evidence would consume inordinate time at trial; the likelihood that the jury might confuse the prior incident with the charged offense; whether the prior domestic violence occurred recently or is remote in time; and whether the defendant was convicted and punished for the prior offense. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119; *Johnson*, *supra*, 185 Cal.App.4th at pp. 533–535; *People v. Balcom* (1994) 7 Cal.4th 414, 427.)

*3. No abuse of discretion occurred*

Appellant contends the evidence of the prior domestic violence incident was inadmissible under Evidence Code section 1109 because the killing of Diao and Zhang was not a domestic violence offense within the meaning of Evidence Code section 1109, subdivision (d)(3). We disagree.

Evidence Code section 1109, subdivision (d)(3) defines "domestic violence" by reference to the definitions contained in two different statutes: " 'Domestic violence' has the meaning set

forth in Section 13700[7] of the Penal Code.  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  Family Code section 6211 in turn broadly defines "domestic violence" as abuse perpetrated against, inter alia, a spouse or "[a]ny other person related by consanguinity or affinity within the second degree."  Appellant concedes that under this definition his in-laws were related to him by affinity, and therefore the charged crimes constituted "domestic violence" under the Family Code.  But appellant argues that because of Evidence Code section 1109, subdivision (d)(3)'s requirement of "a hearing conducted pursuant to [Evidence Code] Section 352" in reference to "domestic violence" as defined in Family Code section 6211, the broader definition of domestic violence only applies to the prior act of domestic violence, and not to the charged offense.

Evidence Code section 1109 itself contains no indication that a different definition of "domestic violence" is intended to apply to evidence of the charged domestic violence offense than to a prior domestic violence crime.  Moreover, appellant's argument ignores the plain language of Evidence Code section 1109, subdivision (a), which expressly "allows the introduction of prior domestic crimes evidence 'in a criminal action in which the

---

[7] Penal Code section 13700, subdivision (b) defines "domestic violence" as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."

defendant is accused of an offense *involving* domestic violence.' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 166.) To "involve" commonly means " 'to include, contain, or comprehend within itself or its scope.' " (*Ibid.*) Thus, being "accused of an offense *involving* domestic violence" encompasses a broader range of conduct than the domestic violence defined as abuse committed against one of certain specified individuals under Penal Code section 13700. (*Ibid.*)

Appellant's killing of Li's parents plainly *involved* domestic violence as that term is defined in Evidence Code section 1109, making evidence of other domestic violence admissible. And the evidence of the prior domestic violence tended to show that the murders were the culmination of ongoing domestic violence involving the domination and control of Li and her parents through threats and injury. (See *People v. Kerley* (2018) 23 Cal.App.5th 513, 536 [escalating nature of domestic violence].) There was no error in the trial court's admission of the prior domestic violence under Evidence Code section 1109 in this case.

Appellant further contends that evidence of the prior conduct lacked sufficient similarity to the charged conduct for admission under Evidence Code section 1101, subdivision (b). But varying degrees of similarity between the uncharged conduct and the charged offense are required where, as here, evidence of prior conduct is offered to show motive, intent, knowledge, and lack of self-defense. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) Our Supreme Court has explained that " '[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity' " (*People v. Harris* (2013) 57 Cal.4th 804, 841, quoting *Ewoldt*, at p. 403), while " '[t]he least degree of similarity (between the uncharged act and the charged offense) is

required in order to prove intent' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827, quoting *Ewoldt*, at p. 402). To be admissible to prove intent, the uncharged conduct need only " 'be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Leon* (2015) 61 Cal.4th 569, 598, quoting *Ewoldt*, at p. 402.)

Here, the prior misconduct was probative of appellant's motive to kill Li's parents due to his desire to control Li. Our Supreme Court has observed that evidence of motive may be relevant to intent as well as the lack of justification, accident or mistake, and the probative value of "other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) Contrary to appellant's claim, the prior incident did involve Li's parents, as he cursed about them during an argument at which they were not even present when he was attempting to exert control over Li. The evidence also tended to show the absence of justification, accident or mistake in resorting to physical violence against a family member.

Under either Evidence Code section 1101, subdivision (b) or section 1109, the question of admissibility of prior misconduct/domestic violence evidence ultimately comes down to whether the probative value of the evidence is "substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" under Evidence Code section 352. (*People v. Davis* (2009) 46 Cal.4th 539, 602.) Here, the trial court

properly concluded that the evidence was more probative than prejudicial.

The 2013 incident was certainly far less inflammatory than the brutal murders of Li's parents, reducing the possibility the jury's passions would be inflamed by the uncharged conduct. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 205.)  The prior incident was also recent, having occurred only three years before the murders.  Li's additional testimony about the incident consumed very little time, thus reducing any likelihood of confusing the jury.  In short, the trial court properly exercised its discretion in admitting the evidence of the 2013 incident under both Evidence Code sections 1101, subdivision (b) and 1109.

**B.** ***The improper admission of the double hearsay evidence of appellant's threat against Diao was harmless***

Diao told Zhang that during an argument with appellant, appellant threatened to kill Diao and make him disappear so not even the police would find him.  Zhang reported appellant's threat to Li, and Li related the threat in her testimony at trial. Respondent contends this double hearsay was properly admitted under the Evidence Code section 1250 exception to the hearsay rule for the declarants' (that is, Diao's and Zhang's) state of mind[8] and as nonhearsay circumstantial evidence of Li's or her

---

[8] Evidence Code section 1250 provides in pertinent part: "[E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, . . .) is not made inadmissible by the hearsay rule when:  [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at

parents' state of mind to explain Li's, Zhang's or Diao's conduct. (*Clark*, *supra*, 63 Cal.4th at pp. 590–591.)

Li's testimony about the threat to Diao was inadmissible under either theory.  Of course, the statement was inadmissible to prove appellant carried out his threat.  (*People v. Noguera* (1992) 4 Cal.4th 599, 622 ["hearsay statements of victims concerning fears of or threats against them by the accused, when offered to prove the conduct of the accused, are not within the exception to the hearsay rule embodied in Evidence Code section 1250"].)  Further, because Diao's statement, conveyed to Zhang and passed on to Li, did not reveal anything about Diao's or Zhang's mental state, Li's testimony about it did not constitute a statement of the declarant's then-existing state of mind.  The evidence could not come in under the Evidence Code section 1250 exception to the hearsay rule.  (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 (*Ortiz*) ["evidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive and is received for the truth of the matter stated"]; cf. *Clark*, *supra*, 63 Cal.4th at p. 592 [declarant's statement, " 'Oh my gosh, not a 187, please, lady, don't die,' " admissible as hearsay under Evid. Code, § 1250 as an expression of emotional desire and fear of being charged with murder].)

The statement was also inadmissible as nonhearsay circumstantial evidence of Li's fear of appellant because Li was not the declarant.  (*Ortiz*, *supra*, 38 Cal.App.4th at p. 389 [the *declarant's* mental state must be in issue for such evidence to be

---

any other time when it is itself an issue in the action; or  [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

29

relevant].) Finally, contrary to respondent's assertion, the statement does not support a reasonable inference that Diao and Zhang were afraid of appellant because the only evidence on the subject of the victims' mental state was Li's testimony that her parents did *not* fear appellant.[9]

Despite the error in admitting the evidence, we find its effect to be harmless. Li testified that every time she and appellant argued, appellant threatened to kill Li's parents. Given that evidence of appellant's threats against his in-laws was already properly before the jury, the erroneous admission of this statement was neither prejudicial under *Watson*[10] nor did it render the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"]).

## C. *The trial court did not abuse its discretion in allowing Li to testify that she believed appellant was going to get a gun during one of their arguments*

Li testified that throughout their marriage appellant controlled virtually every aspect of her life and started countless

---

[9] When a statement is admitted as nonhearsay circumstantial evidence of the declarant's state of mind or effect on the listener, a limiting instruction is required informing the jury that "the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered." (*Ortiz*, *supra*, 38 Cal.App.4th at p. 389; Evid. Code, § 355.) No limitation on the jury's consideration of this evidence was given here.

[10] *Watson*, *supra*, 46 Cal.2d at page 836.

fights with Li.  Appellant would threaten Li during every argument, and he hit her in February 2013.[11]  Li also testified that during one argument appellant threatened to kill her, and then ran upstairs where he kept guns and knives in two cabinets in the master bedroom.  Li was afraid appellant was going to retrieve one of his guns.  The trial court overruled a defense objection to this testimony on the ground that it went to Li's state of mind.

Appellant contends the trial court prejudicially erred in permitting Li to testify to her belief that appellant was going to get his gun because the testimony was speculative, lacked foundation, and Li's state of mind was irrelevant.  We find no abuse of discretion.

One of the prosecution's theories of the case was that the murders of Li's parents were the culmination of a pattern of domestic violence involving the exercise of dominion and control over Li and her parents through verbal abuse and threats.  In support of this theory the prosecution presented evidence of the couple's constant fighting, appellant's verbal abuse of Li, and a prior domestic violence incident under Evidence Code section 1109.  Li's state of mind was part and parcel of this evidence of domestic violence, and her testimony that she thought appellant was going to retrieve a gun after threatening to kill Li was thus highly relevant to the prosecution's theory.

Further, in light of the fact that Li knew appellant kept guns and knives in the couple's master bedroom upstairs and appellant had just threatened to kill Li, Li reasonably inferred

[11] This is the same domestic violence to which police responded in March 2013.

31

that appellant's purpose in going upstairs was to retrieve a gun. The trial court thus properly overruled the defense objection that Li's testimony lacked foundation and constituted impermissible speculation.

## III. Prosecutorial Misconduct

### A. *The prosecutor did not improperly question appellant about the invocation of his right to remain silent*

Appellant contends that the prosecutor committed misconduct by asking him if he invoked his right to remain silent under *Miranda*[12] during his police interview. He argues the error violated due process under *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), was not harmless beyond a reasonable doubt, and requires reversal. Viewing the cross-examination as a whole, we find no *Doyle* violation in the prosecutor's inquiry about appellant's interview with the police.[13] (See *People v. Collins* (2010) 49 Cal.4th 175, 204 (*Collins*).)

#### 1. Background

On cross-examination, defense counsel elicited testimony from several law enforcement witnesses that appellant spoke with them and was cooperative. On direct examination, appellant testified that when he opened the door to the police he said, " 'It's great timing that you showed up.' " " 'Someone tried to kill me. I almost died.' " Appellant told the police he was very scared and had to protect and defend himself. He also testified that later, when he spoke to detectives he was cooperative.

---

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[13] For this reason, we also conclude the trial court properly denied appellant's mistrial motion and motion for a new trial.

On cross-examination, the prosecutor asked appellant if he invoked his rights under *Miranda* when he spoke with the detectives. Appellant said he did. The prosecutor then asked if he requested to speak to a lawyer, and appellant responded, "Yes. Yes. I remained silent, and I asked for an attorney." The prosecutor asked appellant if the detectives respected his request, and appellant said yes. The prosecutor then asked if the detectives asked him any questions after that, and appellant said no. When the prosecutor next inquired if appellant just kept talking on his own, defense counsel said, "Your Honor, I'm going to object to the testimony regarding the *Miranda*." The trial court overruled the objection, and appellant answered that he did not recall.

The prosecutor asked appellant if he ever told the police he was sorry that his in-laws died, and appellant responded, "I didn't say that." Next, the prosecutor inquired whether appellant requested to talk with his children or asked the police to check on them. Appellant said no. Appellant also stated he never requested to talk to his wife. Finally, the prosecutor asked appellant if he ever said there was an accidental shooting. Appellant answered, "I didn't say that."

On redirect examination, defense counsel inquired whether the detectives ever *asked* appellant if he was sorry about what had happened or if he thought this was a tragedy. Appellant responded, "No, they never asked me this question." Counsel then asked, "There are many things that you were never asked by any police officers; correct?" Appellant answered, "The police officers didn't ask me too many things."

*2. The prosecutor's inquiry about appellant's invocation of his* Miranda *rights did not violate due process*

In *Doyle*, the United States Supreme Court held that "the use against defendant of a postarrest invocation of rights following a *Miranda* admonition violates due process." (*People v. Thomas* (2012) 54 Cal.4th 908, 936, citing *Doyle*, *supra*, 426 U.S. at p. 619; *Collins*, *supra*, 49 Cal.4th at p. 203.)  The rationale for the rule is that " 'it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony.' " (*People v. Clark* (2011) 52 Cal.4th 856, 959.)  "But this does not mean that it always is error to permit evidence that a defendant exercised his right to counsel." (*People v. Huggins* (2006) 38 Cal.4th 175, 198.) Indeed, no *Doyle* violation occurs when the prosecutor's cross-examination does " ' "not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right." ' " (*Thomas*, at p. 936.) Thus, a prosecutor may refer to the defendant's postarrest silence in fair response to an exculpatory claim or in fair comment on the evidence without violating the defendant's due process rights. (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 (*Champion*); see also *Anderson v. Charles* (1980) 447 U.S. 404, 408 (*Anderson*) [*Doyle* does not apply where prosecutor's "questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement"].)

Here, the prosecutor's questions sought to expose the inconsistencies between appellant's trial testimony and the information he had given to the police as well as correct the false impression that appellant had related the entire substance of his

testimony to police. Appellant testified that he spoke to detectives and was cooperative, and he volunteered to police that "someone tried to kill [him]," forcing him to protect and defend himself. But appellant never mentioned to police that there had been an accidental shooting, nor did he tell officers he thought his in-laws' deaths were tragic or unfortunate, much less express any regret about the killings.

Appellant was not entitled to leave the jury with the impression he had been completely forthcoming with police, and that any omissions were due to the fact that the police had simply not asked "too many things." " '*Doyle*'s protection of the right to remain silent is a "shield," not a "sword" that can be used to "cut off the prosecution's 'fair response' to the evidence or argument of the defendant." [Citation.] Questions or argument suggesting that the defendant did not have a fair opportunity to explain his innocence can open the door to evidence and comment on his silence.' " (*Champion*, *supra*, 134 Cal.App.4th at p. 1448; *People v. Delgado* (2010) 181 Cal.App.4th 839, 853.)

Because we find the prosecutor's questions were not "designed to draw meaning from [appellant's] silence" (*Anderson*, *supra*, 447 U.S. at p. 409), we conclude that "[t]he prosecutor was not taking unfair advantage of defendant's exercise of his right to remain silent as substantive evidence that he had a guilty conscience or was hiding something." (*Champion*, *supra*, 134 Cal.App.4th at pp. 1450–1451.)

**B.** *The prosecutor did not misstate the law or lower the People's burden of proving the element of premeditation and deliberation for first degree murder*

Appellant contends the prosecutor committed prejudicial misconduct[14] during closing argument by misstating the law of premeditation and deliberation, thereby violating appellant's federal constitutional right to due process.[15]

*1. Background*

In closing argument, the district attorney told the jury, "So one thing that I can explain to you is this: Premeditation and deliberation is actually something you do every day—maybe not every day. Maybe once a week in Los Angeles, but it is something you engage in." The prosecutor went on to illustrate the elements of premeditation and deliberation by analogizing them to a driver's decision-making process in choosing whether to drive through a yellow traffic light or stop suddenly. The prosecutor explained, "You have a decision to make, 'do I step on the accelerator and fly through this intersection because I can't

---

[14] As our Supreme Court has observed, " '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

[15] Appellant further asserts that counsel was ineffective for failing to object to the prosecutor's argument. Because we conclude the prosecutor's explanation of the concepts of premeditation and deliberation did not constitute prejudicial error, we do not address appellant's ineffective assistance claim.

wait, or do I slam on my brakes and stop?' You have to decide, and when you're making that decision—do I go or do I stop—you're evaluating things. 'If I go, are there pedestrians? Is there a cop around? Am I going to get a ticket? Is there a car that's going to pull out in front of me and cause an accident? If I slam on my brakes, am I going to end up in the middle of the intersection, or do I have enough space to stop? Am I going to be okay?' [¶] You may not verbally say this to yourself. That's crazy. No one is going to be driving going, 'Okay. Should I stop? Should I not? I don't know. Let's think.' No. This happens so quickly. It happens so quickly, but in your mind, you quickly evaluate those things, and you decide and you act. That is premeditation and deliberation. It can happen that fast. You just have to consider the consequences. You just have to weigh the pros and cons, things for and against it, and decide to act. That's what premeditation and deliberation . . . is."

### 2. *Legal principles*

"Under California law, to establish reversible prosecutorial misconduct a defendant must show that the prosecutor used ' "deceptive or reprehensible methods" ' and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] A prosecutor's misconduct violates the federal Constitution if the behavior is ' " ' " ' " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' " ' " ' " (*People v. Caro* (2019) 7 Cal.5th 463, 510.) A prosecutor has wide latitude during closing argument to make assertions of common knowledge or use illustrations based on common experience. (*People v. Ward* (2005) 36 Cal.4th 186, 215; *People v. Loker* (2008) 44 Cal.4th 691, 742.) But in relating the

jury's task to a more common experience, the prosecutor "must not imply that the task is less rigorous than the law requires." (*Centeno*, *supra*, 60 Cal.4th at p. 671.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667; *People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*).)

 *3. Analysis*

Viewed in the context of the prosecutor's whole argument, the yellow light analogy was not improper. Consistent with the law, the prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly. (CALJIC No. 8.20 [" 'deliberate' . . . means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action"]; *People v. Pearson* (2013) 56 Cal.4th 393, 440.) The illustration was consistent with the law. As the jury was instructed, "[T]he law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a

38

mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill." (CALJIC No. 8.20; *People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

In *People v. Avila* (2009) 46 Cal.4th 680, 715 (*Avila*), our Supreme Court rejected the defendant's assertion that the prosecutor had equated " 'the "cold, calculated" judgment of murder [with] deciding whether to stop at a yellow light or proceed through the intersection.' " Rather, the court upheld the prosecutor's argument that "assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Ibid*.)

Pointing to the prosecutor's statement in *Avila* that "the decision to kill is similar, but . . . not . . . in any way . . . the same" as deciding to drive through a traffic light (*Avila, supra*, 46 Cal.4th at p. 715), appellant asserts that the prosecutor here "explicitly argue[d] that the premeditation and deliberation required to drive through a yellow light is the equivalent of the premeditation and deliberation required for first-degree murder." Not so. In the context of the argument it is apparent that the prosecutor did not equate the gravity of a decision to kill with a traffic decision, but used the illustration to show that, like a

39

decision to drive through a yellow light, a premeditated and deliberate decision to kill could be made very quickly.  Indeed, after using the traffic light analogy, the prosecutor reviewed the many conscious decisions appellant had to make before the shootings occurred.  (" 'Which [gun] am I going to pick?' "  "Check to see if [the gun is] loaded."  "[L]oad a bullet into the chamber.")  "Time to reflect.  Time to consider.  Time to think. . . . All this has to happen before he ever pulls the trigger, and then he has to decide where to aim and point.  Every one of these things he decided before he ever took a shot.  This is premeditation and deliberation.  This is considering and weighing and making decisions."

Given the prosecutor's reliance on the language of the specific jury instruction on premeditation and deliberation to emphasize the amount of reflection necessary before these shootings, we find no reasonable likelihood the jury construed the traffic light illustration in an improper or erroneous manner. (*People v. Harrison* (2005) 35 Cal.4th 208, 244 ["When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion' "]; see also *Bell*, *supra*, 7 Cal.5th at p. 111.)

## IV. Defense Counsel's Failure to Call Appellant's Middle Child to Testify at Trial Appears to Have Been a Rational Tactical Choice and Does Not Demonstrate Ineffective Assistance of Counsel

Appellant contends trial counsel was ineffective for failing to call appellant's middle child to testify because the child's testimony would have been consistent with appellant's testimony

about the incident. However, the record does not affirmatively disclose there could have been no rational tactical purpose for not calling the child as a witness. Appellant thus fails to demonstrate ineffective assistance of counsel.

### A. Background

Appellant's nine-year old daughter and his seven-year old son (appellant's middle child) testified at the preliminary hearing for the prosecution. The middle child testified that before the shootings he and his sister were downstairs on the computer and his little brother was upstairs with his grandparents. Appellant went upstairs and spoke with the grandparents in Chinese. Soon appellant and the grandparents started yelling at each other. The middle child could understand Chinese, but could only remember hearing appellant say he was going to call the police. Then the middle child heard gun sounds, and he and his sister went into the downstairs bathroom because they were afraid. At this point the little brother came downstairs and joined his sister and brother in the bathroom. The little brother had blood on his clothes.

The middle child left the bathroom and went halfway up the stairs to see what was happening. He saw his grandmother on her knees with appellant standing over her, "Super close," yelling at her. The grandmother was crying and pleading, "Please don't call the police." The boy heard his grandfather yelling at appellant, but he could not see him. The middle child then returned to the bathroom, and heard more "boom boom." Appellant did not come downstairs until the police arrived.

The middle child testified that he had forgotten some of the things that occurred that night "because it happened a long time

ago."  When asked to look around the courtroom to see if he saw his dad, the child said, "I don't want to."

In argument before trial about the admissibility of evidence of prior domestic violence, defense counsel vigorously opposed admission of any evidence that the father may have physically disciplined the children or was "rough with them."  Counsel declared, "[A]ny testimony of that from these very young children would be extremely prejudicial.  Just based, honestly, on their appearance."

Finally, a letter from the middle child read into the record at appellant's sentencing stated that while Li was at work, his father showed him material on the computer that scared him and appellant forced the middle child to play violent gun games on the computer by threatening to "throw [him] into the patio at night and lock the door."  The boy stated that appellant "did really bad things" at night, making him scared of going to the bathroom or upstairs by himself.  The letter concluded, "I really don't want him to come out forever.  He still gives me the creeps at night."

### B. Legal principles

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.]  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of

establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1211; *People v. Brown* (2014) 59 Cal.4th 86, 109.)

### C. Analysis

Appellant asserts that there could be no rational tactical purpose for defense counsel's failure to call appellant's middle child to testify because the boy was the only witness who was able to corroborate part of appellant's testimony. However, the record does not affirmatively reveal the lack of a rational tactical purpose for not calling the child as a witness. To the contrary, because the decision not to have the middle child testify appears to be the result of a sound strategy, we must reject appellant's claim.

Even if the middle child gave the same testimony as he did at the preliminary hearing a year earlier, that testimony would only corroborate appellant's testimony that he argued with Zhang and Diao, he threatened to call the police on his in-laws, and Zhang got on her knees and begged him not to. The testimony would have had minimal probative value: It would not have corroborated appellant's claim that Diao threatened him with a meat cleaver, much less that appellant's in-laws threatened or committed any violence against him at all. Indeed, the boy's testimony would have had no bearing whatsoever on appellant's

claims of self-defense or that he lacked the requisite mental state for first degree murder.

On the other hand, the middle child's testimony had the serious potential to undermine appellant's credibility since it conflicted with appellant's testimony that his threat to call the police and Zhang's pleading with him not to call occurred *before* he spent up to an hour in his bedroom before a single shot was fired. Given this potential for prejudice, defense counsel's decision not to call the middle child to testify appears to be the result of a sound tactical strategy which we will not second-guess. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ["decisions whether to waive opening statement and whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess"]; *People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

## V.   There Was No Cumulative Error

Appellant contends his conviction should be reversed because of the cumulative effect of the errors identified in his opening brief. (*Taylor v. Kentucky* (1978) 436 U.S. 478, 488, fn. 15.) But we have found no errors that individually or collectively deprived appellant of a fair trial. (*Avila, supra*, 46 Cal.4th at p. 718; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422.)

## VI.   Remand for Resentencing Is Unwarranted

Appellant contends his case must be remanded to allow the trial court to exercise its discretion as to whether to impose a lesser firearm enhancement—10 or 20 years under section 12022.53, subdivisions (b) or (c), instead of 25 years to life under section 12022.53, subdivision (d). We disagree.

As to both counts, appellant was charged with three firearm enhancements: personal use of a firearm (§ 12022.53,

subd. (b)), personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), and personal and intentional discharge of a firearm causing death (§12022.53, subd. (d)).  The jury found all three firearm enhancement allegations true as to both counts.  At sentencing, the trial court specifically addressed its discretion with regard to the firearm enhancements:

"All right.  12022.53(h) specifically gives the Court [the] power to strike a [*sic*] gun enhancement allegations.  *People versus Gutierrez* requires that I give you a clear—give them a clear indication that I would or would not strike the gun allegations.  In this particular case, the clear indication is not only not, it is a categorical refusal to strike the gun allegations.  12022.53(d), (c), and (b).  We'll deal with the (c) and (b) counts in just a moment."

The court sentenced appellant to a term of life without the possibility of parole on each count of murder, and added a sentence of 25 years to life for each of the section 12022.53, subdivision (d) findings.  The court ordered the section 12022.53, subdivisions (b) and (c) enhancements stayed as to each count.  The court then declared, "And again, the Court refuses to strike the 12022.53(d) allegation."

Relying on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), appellant asserts that, because at the time of sentencing in this case, "no published decision had held that a court could strike the greater firearm enhancement and impose the lesser one, this matter should be remanded for the court to exercise its discretion."  (See *id*. at p. 224 ["At the time of resentencing, no published case had held an uncharged lesser firearm enhancement could be imposed in lieu of an enhancement

45

under section 12022.53, subdivision (d) in connection with striking the greater enhancement"].)

Appellant, however, misstates the *Morrison* holding and thereby overlooks a critical distinction between *Morrison* and the instant case. *Morrison* began its analysis by observing that "[c]ase law has recognized that the court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient evidence." (*Morrison, supra,* 34 Cal.App.5th at p. 222.) The court then reasoned that because a court could impose an *uncharged* section 12022.53, subdivision (b) or (c) enhancement in place of an enhancement under section 12022.53, subdivision (d) that was unsupported by substantial evidence, defective, or legally inapplicable in some other respect, "[w]e see no reason a court could not also impose one of these enhancements after striking an enhancement under section 12022.53, subdivision (d), under section 1385." (*Id.* at pp. 222–223.) *Morrison* concluded that remand was necessary because the record did not reveal whether the trial court had understood its discretion to impose a lesser uncharged enhancement under section 12022.53, subdivision (b) or (c) if it were to strike the subdivision (d) enhancement. (*Id.* at p. 224.)

By contrast, in this case the lesser enhancements under section 12022.53, subdivisions (b) and (c) were charged and were also found true by the jury. Moreover, the trial court expressly chose to impose the greater enhancement while staying the lesser ones. Because "we presume that the trial court knew and applied the governing law" in the absence of any evidence to the contrary (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390), we must

conclude that the trial court was aware that striking the enhancement under section 12022.53, subdivision (d) "would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice" (*Morrison*, *supra*, 34 Cal.App.5th at p. 222). Accordingly, a remand for resentencing on the firearm enhancements is unwarranted in this case.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.